**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 09-cv-1463-AP

CENTER FOR NATIVE ECOSYSTEMS
BIODIVERSITY CONSERVATION ALLIANCE
CENTER FOR BIOLOGICAL DIVERSITY
DEFENDERS OF WILDLIFE and
NATURAL RESOURCES DEFENSE COUNCIL,

Petitioners,

v.

KEN SALAZAR, Secretary of the U.S. Department of the Interior, and
SAM D. HAMILTON, Director of the U.S. Fish and Wildlife Service,

Respondents.

**PETITIONERS' REPLY IN SUPPORT OF THEIR MOTION TO**
**SUPPLEMENT THE ADMINISTRATIVE RECORD**

**INTRODUCTION**

Federal respondents erroneously assert that petitioners are asking the Court to review the

agency actions under review based on a "new record developed in the first instance in this

Court."  Resp. Mem. at 14.  Crucially, however, respondents do not dispute (nor can they) that all

of the materials with which Plaintiffs are seeking to supplement the Administrative Record

("AR") (1) are agency-generated materials – the vast majority of which were created by

employees of the Department of the Interior ("DOI") or the Fish and Wildlife Service ("FWS"),

and (2) were all created or received by federal respondents before the decision was made to delist

the Preble's in Wyoming.

Hence, this is not a situation in which a party is seeking to supplement the AR with, e.g.,

litigation declarations, post-decision agency records, third party materials never in the

government's possession, or similar materials that might indeed be characterized as a "new record developed in the first instance" in this Court.  Rather, the far narrower question here is simply whether the Court, in reviewing the Preble's decision and the Solicitor's Memorandum on which it was based, may review additional agency records that indisputably were before the agency when the decisions at issue were made.  See Bar MK Ranches v. Yeutter, 994 F.2d 735, 739 (10th Cir. 1993).  As discussed in petitioners' motion and addressed further below, there is no plausible, let alone compelling, legal reason why the Court should be foreclosed from reviewing these highly relevant agency records.

## I.   THE RECORD SHOULD BE SUPPLEMENTED WITH THE WYOMING CONSULTATION RECORDS THAT WERE BEFORE THE SERVICE WHEN THE PREBLE'S WAS DELISTED IN WYOMING.

**1.**  Before turning to what federal respondents do say in support of their anomalous position that the AR may exclude most (but not all) of the Biological Opinions ("BiOps") and other section 7 consultation documents concerning the Preble's in Wyoming, it is first important to stress what respondents do not dispute.  Respondents make no effort to deny that the consultation documents – including the BiOps generated by the FWS's own Wyoming Field Office, the component of the Service with the most experience with the Preble's in Wyoming – bear directly on the issues before the Court.  Indeed, it is hard to imagine materials more integral to the Court's review of whether Preble's should be stripped of all Endangered Species Act ("ESA") protection in Wyoming than the Service's own official recent consultation records stating, e.g., that Preble's populations in "Wyoming are threatened by ongoing and increased urban, industrial, agricultural, ranching and recreational development; ongoing and increasing wetland/riparian habitat destruction or modification"; and "inadequacy or lack of government

2

protection for the species and its habitats," and prescribing specific conservation measures – now rendered a nullity by the delisting – to ameliorate these ongoing threats.  D.E. 32, Exh. B at 22 (emphasis added).

It is certainly understandable <u>why</u> respondents would want the Court to disregard such patently pertinent materials that not only "relate to the position of the agency's own experts on the question central to this case," <u>Kent County, Delaware Levy Court v. E.P.A.</u>, 963 F.2d 391, 396 (D.C. Cir. 1992), but are difficult to reconcile with respondents' incongruous decision that the Preble's warrants listing and ESA protection in Colorado and yet should be left to its own devices just across the border in Wyoming.  Not surprisingly, however, respondents' legal justification for shielding these materials from judicial review does not withstand scrutiny.

Respondents' central argument is that the consultation records do not constitute "documents and materials directly <u>or indirectly considered by the agency</u>," <u>Bar MK Ranches</u>, 994 F.2d at 739, because the "Service's Colorado Field Office was responsible for making the listing determination at issue here," and <u>that</u> office only "requested <u>summary information</u> from the Service's Wyoming Field Office on consultations in Wyoming between 1998 and 2008 as relevant to preparation of the Final Rule."  Resp. Mem. at 11 (emphasis added).  Respondents further contend that, "[i]n addition to the summary information, the Wyoming Field Office provided the Colorado office with two Biological Opinions in their entirety," and hence the Service has "agreed to correct the record to include these two Biological Opinions," <u>id.</u>, but not the remainder of the consultation documents, including BiOps that are functionally indistinguishable from those included.

In essence, respondents' position is that the Court's ability to review clearly material

agency records – and which were admittedly referred to in "summary" form <u>in the final rule</u> at

issue – turns <u>entirely</u> on whether one Field Office of the FWS happened to transmit them to

another Field Office.  However, the Court's obligation to review the "whole record," 5 U.S.C. §

706, in ascertaining whether the government acted in an arbitrary and capricious fashion does

not, and cannot, depend on such bureaucratic happenstance.

    **2.**  To begin with, respondents' extreme view that the Court should afford virtually blind

deference to respondents' characterization of what constitutes the record is surely not consistent

with controlling precedent.  <u>See</u> Resp. Mem. at 9 ("[T]he agency determines what constitutes the

record and the courts are to base their review on that record."); <u>id.</u> ("Only the agency is in a

position to know what materials were considered in making its decision.").  The Tenth Circuit

has made crystal-clear that the "agency may not unilaterally determine what constitutes the

Administrative Record," <u>Bar MK Ranches</u>, 994 F.2d at 739, and respondents' contrary

suggestion is predicated on a highly selective and self-serving reading of other case law.

    For example, respondents rely on a district court decision from another Circuit, which

explained that the agency "is in a position to indicate <u>initially</u> which of the materials were

'before' it" – a proposition with which plaintiffs concur – but also explained that "[o]f course the

agency does not always have the last word," and that the "agency may not skew the record in its

favor by excluding pertinent but unfavorable information."  <u>Fund for Animals v. Williams</u>, 245

F. Supp. 2d 49, 55-57 (D.D.C. 2003) (emphasis added), vacated by <u>Fund for Animals v. Hogan</u>,

428 F.3d 1059 (D.C. Cir. 2005).[1]  Indeed, the same district judge issued a subsequent ruling on

---

    [1] It is of little moment, but respondents have cited this decision in a manner that
erroneously suggests that it was affirmed by the D.C. Circuit.  <u>See</u> Resp. Mem. at 9.  In fact, the
appellate ruling cited did not address the AR issue at all because the court found that plaintiffs'

the scope of an AR, which applied these very principles in a manner that squarely supports petitioners' position concerning the agency records excluded from the record here.

Thus, in <u>Fund for Animals v. Williams</u>, 391 F. Supp. 2d 191 (D.D.C. 2005), the court addressed whether the FWS could exclude from an AR documents that "were created by the agency itself," as well as another document that was "provided to the agency after it was completed" and is "located in the Service's own files." <u>Id.</u> at 198 (internal quotation omitted). The court found that the plaintiffs had made the necessary "showing" to supplement the AR with these agency generated or obtained records because they were "directly relevant to the promulgation of the rules" at issue – which involved the expansion of hunting on national wildlife refuges – and "contain information adverse to the agency's decision to increase hunting opportunities at the refuges named in the six final rules." <u>Id.</u>  The court concluded that the "defendants cannot justify the exclusion of these highly relevant, adverse documents from the administrative record simply by claiming that the documents were not 'directly or indirectly considered' by the agency." <u>Id.</u> at 199 (citing <u>Envtl. Def. Fund v. Blum</u>, 458 F. Supp. 650, 661 (D.D.C. 1978) (an "agency may not, however, skew the 'record' for review in its favor by excluding from that 'record' <u>information in its own files which has great pertinence to the proceeding in question</u>") (emphasis added).

**3.**  This case likewise illustrates why it would be legally treacherous to afford respondents the extraordinary level of deference they seek to exclude plainly pertinent records in the agency's "own files" from the AR.  Indeed, if anything, the case for inclusion of the documents at issue here is even stronger than in <u>Fund for Animals</u>.  Not only are the consultation documents

---

claims had been rendered moot.

5

"directly relevant" to the Preble's delisting in Wyoming, and not only do they "contain information adverse to the agency's decision" to eviscerate ESA protection throughout much of the Preble's occupied habitat, 391 F. Supp. 2d at 198-99 – including areas previously designated by the Service itself as "critical" to the subspecies' overall survival and recovery – but respondents' arguments for their exclusion simply make no legal or logical sense.

In particular, respondents' argument that the consultation documents, although admittedly in the Service's possession at the time the delisting decision was made, were not "before" the agency and were not "directly or indirectly considered by the agency" is predicated on the contention that the "Service's Colorado Field Office was responsible for making the listing determination at issue here." Def. Mem. at 11 (emphasis added). Hence, in respondents' view, because that Field Office did not happen to physically obtain all of the consultation documents from the Wyoming Field Office, they may be immunized from judicial review, no matter how crucial to the Preble's listing status or how damaging to respondents' defense of the rule.

Plainly, this argument, if endorsed by the Court, would essentially encourage an agency to selectively screen the most problematic agency records from the ostensible decisionmakers so that the agency could later argue that a court also should be precluded from reviewing them. In any event, respondents' assertion that a FWS "Field Office" was "responsible for making" the highly controversial determination to partially delist the Preble's – which followed on the heels of prior efforts to delist the species that the government has since admitted were improperly influenced by high-ranking political appointees in the Interior Department, see Pet. Mem. at 5 – is not only farfetched, but demonstrably wrong. Indeed, on the very next page after making that assertion, respondents acknowledge that the ultimate "decisionmaker" in this case was the

Secretary of the Interior, and that the Colorado Field Office simply "worked on the Final Rule." Resp. Mem. at 12 (emphasis added). Yet respondents cite no authority for the proposition that highly probative agency records generated in another subunit of the same agency – indeed, another subunit in the same regional office of the FWS (Region 6)– may be excluded from the AR on that basis.

Moreover, the record reflects that many more agency officials "worked on" this highly controversial rulemaking than the government acknowledges. For example, because it was a test case for the Interior Department's new approach to partial listings and delistings of species (as authorized by the 2007 Solicitor's Memorandum), the Director of the FWS communicated directly with the Assistant Secretary for Fish Wildlife and Parks concerning the approach taken in the rule. See, e.g., AR G6-47 at 12498-99 (March 2008 memorandum from FWS Director to Assistant Secretary setting forth "background and issues related to the final determination for the Preble's meadow jumping mouse").

In addition, the Regional Director for Region 6 of the FWS – of which both the Colorado and Wyoming Field Offices are component parts – had ongoing involvement in the rulemaking. See, e.g., AR G6-46 at 12497 ("The Regional Director and the Director discussed [the significant portion of the range issue] and our options [for the delisting rule]"). Especially under these circumstances, it is simply untenable for respondents to characterize one Field Office within the FWS as "responsible for" this nationally significant and precedent-setting rulemaking, and to employ that characterization as a rationale for placing highly material agency records off limits to

judicial review.[2]

**4.**  Yet even if respondents' characterization could somehow be reconciled with the reality of the rulemaking proceeding, the government's position would still be unsustainable in light of respondents' concession that the FWS, and particularly the Colorado Field Office, did "expressly consider[] consultation documents" and, specifically, "summary information on ESA consultations in Wyoming."  Resp.  Mem. at 14 (emphasis added).  That is tantamount to an admission that the consultation records were "directly or indirectly considered by" the very agency personnel who defendants themselves characterize as the decisionmakers.  Bar MK Ranches, 994 F.2d at 739 (emphasis added).  It is certainly difficult to fathom how a particular set of records can be "summarized," and the "summary" concededly taken into account in fashioning a regulation, while, at the same time, an agency insists that the underlying records were not even "indirectly considered" in the rulemaking.  Indeed, if this does not constitute, at the very least, the "indirect" reliance on such records, respondents never intimate what would arguably fall in that category.

Instead, apparently recognizing the internal tension in an argument that materials may be relied on in "summary" form without being "directly or indirectly considered," respondents seek to downplay their reliance on the consultation documents by asserting that the "reference in the Final Rule is to summary information – such as the number of consultations that occurred in Wyoming and total acreages – and does not discuss the substance of those consultations."  Resp.

---

[2]  Other offices within DOI and the FWS also had involvement in the rulemaking.  See, e.g., AR G6-46 at 12496 (March 25, 2008 Memorandum from the ESA Regional Recovery Coordinator, Region 6, explaining that "[t]hroughout this process, Washington Office staffs within the Service's Recovery Division have expressed concerns with our approach and the justification employed.").

Mem. at 11 (emphasis added).  But even if respondents' attempt to distinguish "summary information" from "substance" is accepted – although defendants never explain, for example, why the "total acreages" of Preble's habitat discussed in consultation records does not qualify as "substance" – respondents never explain why that distinction should control, or even bear on, what materials should be included in the AR.  In other words, whether labeled "summary" or "substance," the fact is that the Colorado Field Office (and other agency decisionmakers) <u>did</u> purport to take the consultation records into account in some manner – which is more than sufficient to make them part of the AR even under respondents' narrow reading of the law.

**5.**  In any case, respondents' description of how they have relied on the consultation records is incomplete at best.  As common sense would suggest, and as a review of the final rule confirms, respondents did not refer to the consultation documents merely because they are of academic interest to the public.  Rather, <u>they were relied on in an effort to support respondents' decision to maintain the Preble's listing in Colorado, but not in Wyoming</u>.  Thus, the final rule asserts that "[o]ne indication of continuing adverse impacts to the Prebles and its habitat is the number of formal consultations performed to date under section 7 of the Act," 73 Fed. Reg. 39818, and suggests that the relatively smaller number of such consultations that occurred in Wyoming than Colorado strengthens the case for stripping the Preble's of protection in Wyoming.  <u>Id.</u> ("[a]s of June 2008, we have conducted 130 formal section 7 consultations (113 in Colorado, 17 in Wyoming))"); <u>id.</u> at 39820 ("This reduced level of consultations [in Wyoming compared with Colorado] reflects the general lack of development pressure within Preble's htbitat" in Wyoming); <u>id.</u> (comparing the number of consultations in Colorado and Wyoming with respect to road and bridge projects).

In short, respondents' distinction between "summary" and "substance" is meaningless from the vantage point of whether all of the Wyoming consultation materials should be in the AR.  The crucial fact is that respondents, in the final rule, have placed substantive <u>reliance</u> on these materials in attempting to justify the rule, and there is no coherent legal or practical reason why the Court should be foreclosed from perusing the records themselves – and not merely the two BiOps that respondents have conceded were "inadvertently omitted" from the AR, Resp. Mem. at 11 – in assessing whether they do in fact support respondents' finding that the "best available information" supports stripping the Preble's of any ESA protection in Wyoming.  73 Fed. Reg. 39818.

## II. THE RECORD SHOULD BE SUPPLEMENTED WITH THE DOCUMENTS CONSIDERED BY DOI WHEN THE SOLICITOR'S 2007 <u>MEMORANDUM WAS ISSUED.</u>

Respondents do not deny that the 2007 Solicitor's Memorandum played a vital role in their decision to delist the Preble's in Wyoming.  Nor do respondents dispute that there <u>are</u> documents underlying the Memorandum and that are necessary to fully understand the basis for the drastically new approach to ESA listing that was adopted by the Solicitor and expressly incorporated into the Preble's delisting rule.  Indeed, respondents do not even mention the specific document that plaintiffs referred to in their opening memorandum: a letter from a former Assistant Secretary of the Interior on which the Memorandum expressly relies and represents is "on file" in the Solicitor Office.  <u>See</u> Pet. Mem. at 15.  Nonetheless, the government proffers several general reasons for why the Service "appropriately did not include" any materials relating to the Memorandum in the AR.  Resp. Mem. at 17.  None is persuasive.

First, respondents maintain that "Petitioners have not raised an independent challenge to

the Solicitor's opinion, nor could they properly do so."  Resp. Mem. at 16.  Respondents are

wrong on both counts.  As for whether petitioners <u>have</u> "raised an independent challenge" to the

Memorandum, the Petition for Review does so in several ways.  Respondents themselves

concede that the Petition "does raise a procedural claim," Resp. Mem. at 15 n. 5, that squarely

challenges the memorandum as a "guideline" setting forth "criteria for making" listing decisions

that should have been subject to advance public notice and comment pursuant to section 4(h) of

the ESA, 16 U.S.C. § 1533(h); <u>see</u> Pet. for Rev. at 19-20.

 Respondents, however, summarily assert that this is a "purely legal claim" and that

"documents underlying the [Memorandum] are not pertinent to the resolution of this claim[]."

Resp. Mem. at 15 n. 5.  That assertion is unaccompanied by any legal authority and is simply

wrong.  The fact that a challenge may be "procedural" hardly means that there are no AR

documents "pertinent" to its resolution.  For example, this and other courts routinely resolve

claims that agency decisions have failed to fully comport with the purely procedural requirements

of the National Environmental Policy Act, and they do so based on, rather than in ignorance of,

the administrative records bearing on such compliance.

 Similarly, documents underlying issuance of the Solicitor's Memorandum may be directly

"pertinent to the resolution" of petitioners' procedural challenge.  For example, if such materials

reflect that high-ranking DOI officials were acutely aware that the Solicitor was adopting a

dramatically new approach to listing that FWS employees throughout the country would have

little choice but to follow in subsequent listing decisions – as, indeed, has been the case with

regard to the Preble's, wolf, and other listing and delisting decisions made since the

Memorandum was issued – that would have an enormous bearing on petitioners' claim that the

Memorandum effectively established new "criteria for making the findings" on ESA listing and delisting petitions, and hence was required to have been preceded by public notice and comment under section 4(h) of the ESA.  16 U.S.C. § 1533(h).

In addition to the procedural challenge that respondents concede is in the Petition for Review, petitioners' first claim also directly challenges the substance of the Solicitor's Memorandum, as well as the Preble's delisting that resulted from the Memorandum.  Thus, the Petition states that the Memorandum "forms the basis of the FWS's decision to delist the Preble's in Wyoming, and is being interpreted to allow state-by-state listings of other species," and further states that respondents' "adoption of this policy interpreting the phrase 'significant portion of its range' and specifically its application here, represents a dramatic reversal of longstanding agency policy and practice, is contrary to the plain language of the ESA, and undermines the purpose of the ESA to afford sufficient species protection to not only stave off species' extinction, but to bring about the species' recovery."  Pet. for Rev. at 12-13 (emphasis added).  Even without the "liberal" construction of the Petition that respondents concede must apply, Resp. Mem. at 16, petitioners could hardly have been any clearer in stating that they were challenging both the Memorandum and the Preble's delisting decision applying it.

As for whether petitioners "could" properly pursue such a challenge to the Memorandum, Resp. Mem. at 16, respondents misapprehend the law, including the unpublished opinion on which they rely for the proposition that a Solicitor's Memorandum is always immune from judicial review.  In Glamis Imperial Corp. v. Babbitt, slip op., 00-cv-1934-W (S.D. Cal. Oct. 31, 2000) (Exh. 2 to Resp. Mem.), the court simply held that there was no "final agency action" to review in that case because there was an "*ongoing* process toward a final administrative

decision" concerning the specific project at issue, and it was "undisputed that no final action has been taken based on" the particular "Opinion Letter" challenged by the plaintiffs.  Id. at 4 (emphasis in original).  The necessary implication of the ruling is that when final action has concededly been taken based on such a document – as has occurred here – there is nothing to preclude a party from challenging the specific action as well as the broader policy pronouncement on which it is based.

Indeed, that understanding is consistent with Supreme Court precedent.  In Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726 (1998), the Court held that, although a broad agency policy document – in that case a "federal land and resource management plan" adopted by the Forest Service – may not be susceptible to judicial review when first issued, it may be challenged when relied on to make specific decisions with concrete impacts.  Id. at 734 ("The Sierra Club thus will have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain.  Any such later challenge might also include a challenge to the lawfulness of the present Plan if (but only if) the present Plan then matters, i.e., if the Plan plays a causal role with respect to the future, then-imminent, harm from logging."); see also Center for Native Ecosystems v. Cables, 509 F.3d 1310, 1329 (10th Cir. 2007) (the Forest Service's issuance of "annual operating instructions," which the agency used as a management tool to identify when and where grazing should be permitted, constituted final agency actions that could be challenged when they were incorporated into grazing permits).

In sum, because the Solicitor's Memorandum has now been applied in a manner that has practical, real-world consequences – including the removal of all ESA protection for the Preble's in Wyoming – petitioners may indeed challenge (and have challenged) both the Memorandum

and the Preble's rule stemming from it.  By the same token, for the Court to fairly review the "whole" record pertaining to these inextricably intertwined agency decisions, the Court should have the full record underlying the Memorandum, as well as the Preble's delisting that concededly followed from it.[3]

## CONCLUSION

For the foregoing reasons, as well as those set forth in petitioners' opening memorandum, the Court should order respondents to supplement the AR with the Wyoming consultation records, as well as the documents underlying the Solicitor's Memorandum.  Because, under the current scheduling order, petitioners must file their opening brief within 45 days after the Court rules on this motion, petitioners respectfully request that respondents be ordered to furnish the parties and the Court with a supplemental record, and any accompanying privilege log, with regard to these materials within fifteen days of the Court's order.  Alternatively, if respondents require some additional time, petitioners do not object so long as the briefing schedule is adjusted accordingly.[4]

---

[3]  Respondents' effort to distinguish Northwest Environmental Advocates v. EPA, 2008 WL 111054, at *2 (D. Or. Jan. 7, 2008) on the grounds that that case involved a "scientific document" and not a legal one, Resp. Mem. at 17, has little force.  The Solicitor's Memorandum plainly dictated the approach that Respondents followed in using a geographical boundary to protect some Preble's but not others, and hence it was just as "integral to the challenged decision" as the scientific guidance document at issue in Northwest Advocates.  Resp. Mem. at 17.

[4]  Respondents' request to file a motion to dismiss at this late date should be denied. Resp. Mem. at 18.  Not only would such a motion be untimely at this stage, but any legal arguments that respondents wish to make concerning the justiciability of any of petitioners' claims may be raised in briefing on the merits.

Respectfully submitted,

/s/Eric R. Glitzenstein
Eric R. Glitzenstein
Meyer Glitzenstein & Crystal
Suite 700
1601 Connecticut Ave., N.W.
Washington, D.C.  20009
Tel.: (202) 588-5206
Fax: (202) 588-5049
eglitzenstein@meyerglitz.com


/s/Michael Harris
Michael Harris
Environmental Law Clinic
University of Denver, Sturm College
of Law
2255 E. Evans Ave., Room 365H
Denver, Colorado 80208
Tel.: (303) 871-7870
Fax: (303) 871-6991
mharris@law.du.edu


/s/Jason C. Rylander
Jason C. Rylander
Defenders of Wildlife
1130 17th Street, N.W.
Washington, D.C.  20036
Tel.: (202) 682-9400 x 145
Fax: (202) 682-1331
jrylander@defenders.org

Counsel for Petitioners