**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Civil Action No. 1:09-cv-1463-JLK

CENTER FOR NATIVE ECOSYSTEMS,
BIODIVERSITY CONSERVATION ALLIANCE,
CENTER FOR BIOLOGICAL DIVERSITY,
DEFENDERS OF WILDLIFE, and
NATURAL RESOURCES DEFENSE COUNCIL,

        Petitioners,

    v.

KEN SALAZAR, Secretary of the Interior, and
ROWAN GOULD, Director, U.S. Fish & Wildlife Service,

        Respondents,

STATE OF WYOMING, WYOMING FARM BUREAU FEDERATION
and WYOMING STOCK GROWERS ASSOCIATION,

        Intervenors-Respondents.

---

**WYOMING FARM BUREAU FEDERATION'S AND WYOMING STOCK GROWERS**
**ASSOCIATION'S RESPONSE TO RESPONDENTS'**
**MOTION FOR VOLUNTARY REMAND AND VACATUR**

---

        Intervenors, Wyoming Farm Bureau Federation and Wyoming Stock Growers

Association, through their attorneys, hereby respond to Respondents' Motion for Voluntary

Remand and Vacatur (Dkt. Nos. 69, 70).[1]

---

[1]Respondents are Ken Salazar, Secretary, Department of the Interior, and Rowan Gould,
Director, U.S. Fish & Wildlife Service ("FWS").  For convenience, Respondents will be
collectively referred to as FWS.

## **BACKGROUND**

The Preble's meadow jumping mouse (*Zapus hudsonius preblei*) are small rodents with long tails, large hind feet, and long hind legs, [and] [t]he total length of an adult is approximately 187 to 255 millimeters (7 to 10 inches), with the tail comprising 108 to 155 millimeters (4 to 6 inches) of that length.[2] *Final Rule to Amend the Listing for the Prebles Meadow Jumping Mouse (Zapus hudsonius preblei) to Specify Over What Portion of Its Range the Subspecies is Threatened*, 73 Fed. Reg. 39,790 (July 10, 2008) ("Delisting Rule").  In 1998, the FWS listed the mouse as a "threatened species" under the Endangered Species Act ("ESA") in both Colorado and Wyoming.  *Final Rule to List the Preble's Meadow Jumping Mouse as a Threatened Species*, 63 Fed. Reg. 26,517, 26,526 (May 13, 1998).  The FWS then designated critical habitat for the mouse in both Colorado and Wyoming in 2003.[3]  *Designation of Critical Habitat for the Preble's Meadow Jumping Mouse (Zapus hudsonius preblei)*, 68 Fed. Reg. 37,276 (June 23, 2003).

On July 27, 1999, the FWS received a petition to remove the mouse from the ESA's list of threatened and endangered species.  68 Fed. Reg. 70,523, 70,524 (Dec. 18, 2003).  The FWS thereafter received two other petitions to remove the mouse from the list.  Pursuant to 16 U.S.C. § 1533(b)(3)(A), the FWS examined the petitions to determine whether they presented "substantial scientific or commercial information indicating that the petitioned action may be warranted."  On December 18, 2003, the FWS concluded that the petitions did not present substantial scientific or commercial information indicating that delisting may be warranted and declined to proceed with a further status review of the mouse.  68 Fed. Reg. at 70,523.

---

[2] WFBF and WSGA do not concede that this mouse is a distinct subspecies of *Zapus hudsonius*.

[3] The FWS subsequently revised the designated critical habitat for the Preble's on December 15, 2010. 75 Fed. Reg. 78,430 (Dec. 15, 2010).

On December 17, 2003, the State of Wyoming and the Coloradans for Water Conservation and Development filed separate petitions to delist the mouse, again triggering the ESA's administrative process for review of petitions.  69 Fed. Reg. 16,944, 16,945 (Mar. 31, 2004); *see also* 16 U.S.C. § 1533(b)(3)(A); 50 C.F.R. § 424.14 (delisting process triggered by the filing of a petition to delist or on the Secretary's own initiative).  After examining the petitions, the FWS concluded that the petitions presented substantial information to indicate that delisting of the mouse may be warranted.  69 Fed. Reg. at 16,945.  Thus, the FWS commenced a status review of the mouse to determine whether the delisting of the mouse was or was not warranted.  *Id.*

On February 2, 2005, the FWS issued a 12-month finding on the December 2003 petitions, this time finding that delisting the mouse was warranted.  *See* 70 Fed. Reg. 5,404 (Feb. 2, 2005).  Accordingly, the FWS issued a proposed rule to remove the mouse from the ESA's list of threatened and endangered species.  *Id.*  On February 17, 2006, the FWS extended the time to take final agency action on the proposed delisting rule by six months.  71 Fed. Reg. 8,556 (Feb. 17, 2006).  As part of the extension, the FWS reopened the comment period on the proposed delisting rule for a period of 60 days to solicit additional comments.  *Id.*

Subsequently, the State of Wyoming sued the FWS in Wyoming for failing to publish a final delisting determination.  *Id.* The reached a settlement whereby the FWS agreed either to withdraw its 2005 proposed rule to delist or publish a new proposed rule considering the mouse's taxonomy and its threatened status in light of the current data on distribution, abundance, and trends.  *Id.*  Meanwhile, on March 16, 2007, the Solicitor of the United States Department of the Interior ("Solicitor") issued an M-Opinion entitled: "*The Meaning of "In Danger of Extinction Throughout All or a Significant Portion of its Range*."  ("M-Opinion").  (reproduced in AR F-87 at 006580).  The M-Opinion concluded:

> The SPR phrase is a substantive standard for determining whether a species is an endangered species—whenever the Secretary concludes because of the five-factor analysis that a species is "in danger of extinction throughout . . . a significant portion of its range," it is to be listed and the protection of the ESA applied to the species *in that portion of its range where it is specified as an "endangered species."*

*Id.* at 006582 (emphasis added).

After considering the M-Opinion, and after a thorough examination of the best scientific and commercial data available, the FWS set forth to determine whether the mouse was threatened throughout all its range, or only in a portion of its range. This determination resulted in the publication of *Revised Proposed Rule To Amend the Listing for the Prebles Meadow Jumping Mouse (Zapus hudsonius preblei) To Specify Over What Portion of Its Range the Subspecies Is Threatened*, 72 Fed. Reg. 62,992 (November 7, 2007). The proposed revised rule determined that the mouse "is not threatened throughout all of its range; and the portion of the current range of the subspecies located in Colorado represents a significant portion of the current range where the mouse is likely to become endangered within the foreseeable future." *Id.* As a result, the FWS proposed that the mouse retain its ESA protection only in the Colorado and not in Wyoming. *Id.*

On July 10, 2008, the FWS published the Delisting Rule. Notably, the FWS agreed with the M-Opinion and adopted the Solicitor's interpretation of the SPR language. 73 Fed. Reg. at 39,801. It also concluded that the only significant portion of its range in which the mouse was threatened was in Colorado and withdrew ESA protection from the mouse in Wyoming. Id. at 39,790.

On June 23, 2009, Petitioners filed the instant action challenging the Delisting Rule. On August 25, 2009, this Court granted the Wyoming Farm Bureau Federation ("WFBF") and the

Wyoming Stock Growers Association ("WSGA") intervention to defend the Delisting Rule.

Dkt. No. 13.

On August 25, 2010, the U.S. District Court for the District of Montana vacated and set aside the final rule to remove ESA protections for gray wolves in the northern Rocky Mountain DPS. *Defenders of Wildlife v. Salazar*, 729 F. Supp. 2d 1207 (D. Mont. 2010).[4]  The court ruled that FWS's interpretation of the SPR language that adopted the M-Opinion's reasoning was contrary to the plain language of the ESA and unlawful.  *Id*. at 1211.  Following that decision, on September 30, 2010, the U.S. District Court for the District of Arizona, in a four-page ruling that relied on *Defenders of Wildlife*, held that FWS's interpretation of the SPR language, which adopted the M-Opinion's reasoning, was contrary to the plain language of the ESA and unlawful, and set aside the final rule regarding the listing of the Gunnison's prairie dog.  *WildEarth Guardians v. Salazar*, No. 09-00574-PHX-FJM, 2010 WL 3895682, *6 (D. Ariz. Sept. 30, 2010).

On May 4, 2011, the new Solicitor withdrew the previous Solicitor's M-Opinion. *Withdrawal of M-37013–The Meaning of "In Danger of Extinction Throughout All or a Significant Portion of its Range."* (March 4, 2011) ("the Withdrawal of M-Opinion") (available at http://www.doi.gov/solicitor/opinions/M-37024.pdf).  In so doing, the new Solicitor did not state that she disagreed with the M-Opinion nor did she issue a new opinion.

On May 13, 2011, in an apparent turnaround from its previous position regarding the interpretation of the SPR language, the FWS moved for Voluntary Remand and Vacatur of the Delisting Rule.  ("Motion").  Dkt. No. 69.  The FWS asks this Court to vacate and remand the Delisting Rule while the FWS reconsiders the "interpretation and implementation" of the SPR

---

[4] On April 15, 2011, the President signed the House and Senate engrossed version of H.R. 1413, the Department of Defense and Full-Year Continuing Appropriations Act, 2011, which became Pub. L. 112-010, 125 Stat. 38, on that date.  Section 1713 ("§ 1713") thereof required that the Secretary of the Interior reissue the final rule that was previously set aside in this Court's holding.  On May 5, 2011, FWS reissued that rule.  76 Fed. Reg. 25,590 (May 5, 2011).

language and engages in notice and comment as part of that process. Federal Respondents'
Memorandum in Support of Motion for Voluntary Remand and Vacatur ("FWS Mem.") at 13.

As demonstrated below, this Court should deny the Motion and allow this case to proceed
to the merits. In the alternative, this Court should remand the Delisting Rule without vacatur. At
a minimum, should this Court determine that remand and vacatur are appropriate, this Court
should retain jurisdiction to ensure that the FWS conforms to its promised schedule to consider
the Coloradans for Water Conservation and Development's petition to delist the mouse. *See*
FWS Mem. at 15–17 (promising to issue a 12-month finding by June 1, 2013).

## ARGUMENT

### I. THE FWS HAS NOT MET ITS BURDEN OF SHOWING THAT A REMAND IS APPROPRIATE.

#### A. The "New Developments" Cited By FWS Do Not Justify Remand.

The FWS set forth two factors that it believes justify a remand. First, it recites that "two
district courts have concluded that the legal reasoning contained in the M-Opinion that was
applied to the [Delisting Rule] violates the plain language of the ESA." FWS Mem. at 8.
Second, the FWS emphasizes that the present Solicitor "has withdrawn the M-Opinion and the
Service is in the process of drafting a revised interpretation of the 'significant portion of the
species' range' language at issue in this case." *Id*. at 8–9. These two factors, alone or in
combination, do not justify remand.

##### 1. The FWS may not rely on two district court cases as a new development that justifies a remand.

The two district court decisions on which the FWS rely suggest that the M-Opinion was
incorrect in its interpretation of the SPR language and that the Delisting Rule, which adopted that
interpretation, was unlawful. FWS Mem. at 9. Notably, both cases are on appeal to the Ninth
Circuit. *See Defenders of Wildlife, et al. v. Salazar, et al.*, Consolidated Case Nos. 10-35885,

10-35886, 10-35894, 10-35897, 10-35898 and 10-35926; and *WildEarth Guardians v. Salazar, et al.*, Case No. 10-17638.  But an agency may not base a voluntary remand on a change in law when that change consists of district court opinions:

> [W]hen an agency is confronted with an *undisputable indication that its rule is illegal*, either because of the reasoning of a *Supreme Court* decision or intervening legislation, it may be entitled, indeed, obliged, to decline to apply it.

*Tribune Co. v. F.C.C.*, 133 F.3d 61, 68 (D.C. Cir. 1998) (emphasis added).  Although this case involved whether an agency could rely on a change in law to justify a change in agency policies and procedures, it is equally applicable to a request for remand based on a perceived change in the law.

Indeed, the mere possibility that the Delisting Rule may be illegal, as indicated by the two district court decisions, "is not in the same ballpark as a clear manifestation that the rule, without any further inquiry, is illegal." *Id.* [5]  In fact, district court decisions, while persuasive, do not constitute binding precedent even in their own district.  *In re Executive Office of President*, 215 F.3d 20, 24 (D.C. Cir. 2000) (district court decisions do not establish the law of the circuit or even the law of the district); *Anderson v. Romero*, 72 F.3d 518, 525 (7th Cir.1995) (district court decisions have no precedential weight).  Therefore, the FWS's reliance on the two district court decisions as justification for a remand is badly misplaced.

> **2.    The FWS may not rely on the Withdrawal of the M-Opinion and its own decision to reinterpret the SPR language to justify a remand.**

Importantly, the Withdrawal of M-Opinion was not issued because the new Solicitor had determined, after the reasoned deliberation and research that went into the M-Opinion, that the

---

[5] As demonstrated above, Congress ordered the vacated rule wolf delisting rule in *Defenders of Wildlife* reissued, which FWS has done.  In effect, this leaves only one decision, *WildEarth Guardians,* which itself relied on *Defenders of Wildlife.*

M-Opinion was legally incorrect.  *Id*.  Rather, the Solicitor withdrew it as an accommodation for

the FWS:

> In light of these [two] adverse [district court] decisions, the *Fish and Wildlife Service (FWS) has notified me of its intention to reconsider how it applies the SPR phrase* and to develop guidance on how to apply the SPR phrase in making decisions to add or remove species from the lists of threatened and endangered species.  *Therefore*, *I hereby withdraw* Opinion M-37013 *to facilitate FWS's review of the SPR phrase and issuance of new guidance*.

Withdrawal of M-Opinion at 1 (emphasis added).  Notably, the new Solicitor addressed her

Withdrawal of M-Opinion to the Secretary of the Interior, and the Assistant Secretary for Fish

and Wildlife and Parks, not the Director of FWS, to whom the M-Opinion was addressed.  Taken

together, the accommodating Withdrawal of M-Opinion and FWS's decision to redraft the

interpretation of the SPR language, present a fair inference that one or both of these highly

placed officials told the Solicitor to withdraw the opinion, irrespective of whether it was correct.

Thus, the Withdrawal of M-Opinion does not constitute a new circumstance giving rise to doubt

concerning whether the Delisting Rule was properly promulgated, but simply reflects a policy

decision by the Department of the Interior.

### 3. The request for a remand is the result of a change in administrations, not any new developments that might justify remand.

Though the two district court decisions, the Withdrawal of M-Opinion, and FWS's

decision to reinterpret the SPR language do not constitute the requisite grounds upon which to

premise a voluntary remand, they may serve as a convenient justification for a change in policy

by a new administration.  Indeed, it appears that the Motion is the result not of a reasoned legal

analysis, but rather of a policy decision of a new administration.  This Court must be especially

vigilant not to allow the "pretext of correction" of legal error to be used as "a guise for changing

previous decisions because the wisdom of those decisions appears doubtful in the light of changing policies." *American Trucking Ass'ns v. Frisco Transp. Co.* 358 U.S. 133, 146 (1958).

## B.  The Cases FWS Cites Are Inapposite.

In support of its remand argument, the FWS relies principally on *Trujillo v. General Elec. Co.*, 621 F.2d 1084, 1086 (10th Cir. 1980.)  FWS Mem. at 9.  Specifically, the FWS places great emphasis on *Trujillo's* statement that "[a]dministrative agencies have the inherent authority to reconsider their own decisions, since the power to decide in the first instance carries with it the power to reconsider."  *Id. Trujillo* is inapposite because it involved an adjudication, not a notice and comment rulemaking.[6]

In *Trujillo*, the District Director of the Equal Employment Opportunity Commission ("EEOC"), after he was presented with additional evidence, rescinded his previously issued right-to-sue-letter and reconsidered his earlier decision that there was no probable cause to believe claimant was unlawfully discriminated against.  *Id.* at 1086.  The Tenth Circuit properly found that the Director of EEOC, in making an adjudication in an individual case involving past facts*,* had the inherent power to reconsider that judgment.  *Trujillo* does not stand for the

---

[6] The Attorney General's Manual on the Administrative Procedure Act (1947) explains that "the entire Act is based upon a dichotomy between rulemaking and adjudication."  *Id*. at 14.  The Manual then explains this crucial difference between rulemaking and adjudication:

> The object of the rule making proceeding is the implementation or prescription of law or policy for the future, rather than the evaluation of a respondent's past conduct.  Typically, [rulemaking] issues relate not to the evidentiary facts, as to which the veracity and demeanor of witnesses would often be important, but rather to the policy-making conclusions to be drawn from the facts.  Conversely, adjudication is concerned with the determination of past and present rights and liabilities.  Normally, there is involved a decision as to whether past conduct was unlawful, so that the proceeding is characterized by an accusatory flavor and may result in disciplinary action.

*Id.,* available at
http://www.oalj.dol.gov/PUBLIC/APA/REFERENCES/REFERENCE_WORKS/AGTC.HTM,
The Delisting Rule was an informal rulemaking under 16 U.S.C. § 1533(b)(3)(A).

proposition that an agency has inherent power to reconsider notice and comment rulemakings without going through notice and comment.  Indeed, this proposition was expressly rejected in *Natural Res. Def. Council v. Abraham*, 255 F.3d 179, 202–03 (2d Cir. 2004):

> DOE cites a number of cases to support its claim that it possesses an inherent power to reconsider a final rule following its announcement in the federal register. . . . [T]hese cases . . . simply recognize the power to reconsider decisions reached in *individual* cases by agencies in exercising *quasi-judicial powers*, which are *distinct from the legislative powers and their attendant procedures involved in rulemaking.*

*Id.* at 202 (emphasis added).  The court distinguished *Trujillo* because it constituted an example of adjudication, not rulemaking.  *Id.* at 203.

In *Utility Group Solid Waste Activities Group v. E.P.A.*, 236 F.3d 749, 752 (D.C. Cir. 2001), the D.C. Circuit also rejected the concept that an agency has "inherent authority" to reconsider rulemaking.  In that case, the EPA made a technical correction to a rule without going through the process prescribed by the APA.  *Id.* at 752.  The D.C. Circuit ruled: "Our court has never recognized such an 'inherent power' *in the rulemaking context*, and we decline to do so now." *Id.* (emphasis added).

The D.C. Circuit characterized the cases cited to support the claim of "inherent authority" as "decisions, using the . . . analogy to judicial proceedings," in which courts "sustained an agency's inherent power to correct errors in an *adjudication*." *Id.* at 753 (emphasis added).  But the D.C. Circuit ruled that "the judicial analogy does not work here [because] [t]his was not an *adjudication* [since] EPA acted in a *quasi-legislative fashion*.  The rule as initially promulgated was legislative in nature." *Id.* (emphasis added).  The D.C. Circuit held that "the EPA would [not] be powerless to correct its mistakes.  It has the power to do so, so long as it follows certain procedures  . . . spelled out in APA [5 U.S.C. § 553(b)] for usual notice and comment rulemaking." *Id.*  Thus, *Trujillo* is inapplicable to reconsideration of the Delisting Rule.

10

The FWS also relies on *Ethyl Corp. v. Browner*, 989 F.2d 522, 524 (D.C. Cir. 1993) for

the proposition that courts "commonly grant such motions [for voluntary] remand, preferring to

allow agencies to cure their own *mistakes* rather than wasting the courts' and the parties'

resources reviewing a record that *both sides acknowledge to be incorrect and incomplete*." FWS

Mem. at 9 (quoting *Ethyl* at 524) (emphasis added).[7] There is no such agreement here. Indeed,

WFBF and WSGA contend that the M-Opinion and the Delisting Rule correctly interpreted and

applied the SPR language. Additionally, the new Solicitor has offered no reasoned legal opinion

rejecting the M-Opinion. Moreover, there is no new evidence in this case to suggest that the

record was "incorrect and incomplete," as was the case in *Ethyl*. The cases cited by FWS simply

do not support its premise.

## II.   EVEN IF THIS COURT WERE TO REMAND THE DELISTING RULE, IT MAY NOT VACATE THE RULE WITHOUT MAKING AN INDEPENDENT DETERMINATION THAT THE RULE IS UNLAWFUL.

### A.   This Court May Not Vacate The Delisting Rule Without First Determining That It Is Unlawful.

Even if the facts and law do support a voluntary remand of the Delisting Rule, they do

not support vacatur of that rule. The law provides that there are only two ways to vacate or

change a rule: the agency may repeal or change it after notice and comment as prescribed by the

APA, or a court may find on the merits that it is unlawful and vacate it. The plain language of

the statutory scheme of the APA demonstrates this.

A federal agency "'literally has no power to act . . . unless and until Congress confers

power upon it.'" *Am. Library Ass'n v. FCC*, 406 F.3d U.S. 689–98 (D.C. Cir. 1998) (quoting *La.*

*Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986)); *see also Atlantic City Elec. Co. v. FERC*,

---

[7] After the EPA began settlement discussions with Ethyl, Ethyl presented new tests completed since the original decision that "undermined the view" that resulted in the rule, and all parties agreed that the rule was flawed. *Ethyl*, 989 F.2d at 523–24.

295 F.3d 1, 8 (D.C. Cir. 2002) (noting "federal agency, as 'creature of statute' has *only* those authorities conferred upon it by Congress") (internal quotation omitted, emphasis in original). The "APA requires government agencies to follow certain procedures, including providing for public notice and comment, before enacting or amending a rule." *National Parks Conservation Ass'n v. Salazar*, 550 F.Supp.2d 3, 4 (D.D.C. 2009) (citing 5 U.S.C. § 553(b), (c)). Moreover, "[a]n agency must follow the same procedure in order to repeal a rule." *Id*. (citing 5 U.S.C. § 551(5)); *see also American Fed'n of Gov't Employees AFL-CIO Local 3090 v. Federal Relations Authority*, 777 F.2d 751, 777 (D.C. Cir. 1985):

> [A]n agency seeking to repeal or modify a legislative rule promulgated by means of notice and comment rulemaking is obligated to undertake similar procedures to accomplish such modification or repeal . . . and to provide a reasoned explanation for the change addressing with some precision any concerns voiced in the comments received.

The APA also provides that a judge may not set aside an agency rule except after finding on the merits that it is unlawful: "The reviewing court shall . . . hold unlawful and *set aside* agency action, findings, and conclusions of law *found* to be . . . arbitrary and capricious, an abuse of discretion, or otherwise not in accordance with law" or one of four other listed criteria for finding the rule unlawful. 5 U.S.C. § 706(2)(A)–(F) (emphasis added).

These two concepts, the power of an agency to repeal its legislative rules through new rulemaking and the power of a reviewing court to vacate an agency rule by finding the rule unlawful, are clearly prescribed by the plain language of the APA and are the only methods the APA allows. Here, the FWS attempts to bypass the rulemaking requirements of the APA by asking that this Court vacate the rule without making findings on the merits.

In *National Parks Conservation*, the court denied the motion for vacatur under circumstances on all fours with those here. In that case, the Office of Surface Mining and Reclamation and Enforcement ("OSM") had, pursuant to the rulemaking requirements of the

APA, adopted a stream buffer zone ("SBZ") rule "regulating excess mining spoil, disposal of mine waste, stream buffer zones, and stream-channel diversions." *National Parks Conservation*, 660 F.Supp.2d at 4.  Environmental groups filed suit alleging that the rule was unlawful under various federal laws.  The National Mining Association ("NMA") intervened to defend the rule. *Id.*  Newly appointed Secretary Salazar "determined that the OSM erred in failing to initiate consultation with [FWS] to evaluate possible effects of the SBZ rule[.]"  *Id.*  As a result, OSM moved the court for an order remanding and vacating the SBZ rule, and confessed that "serious legal deficiencies" existed in the rule.  *Id.*  NMA contested the motion and the allegation of legal deficiencies.  *Id.*  The plaintiffs supported the remand and vacatur.  *Id.*

The court could find "no precedent to support the proposition that it should remand and vacate the SBZ rule under the circumstances presented here."  *Id.*  Indeed, it found that "granting vacatur . . . would allow the OSM to do what they cannot do under the APA—repeal a rule without public notice and comment, without judicial consideration of the merits.[8]

Similarly, in *Carpenters Industrial Council v. Salazar*, 734 F.Supp. 2d 126, 129 (D.D.C. 2010), the plaintiffs ("CIC") filed suit against the FWS alleging that the 2008 critical habitat designation for the northern spotted owl violated several federal statutes and that FWS should designate less habitat.  Various environmental conservation groups intervened claiming that FWS should designate more habitat.  *Id.* at 131.  After receiving a report from its Inspector General that an Assistant Secretary took actions that "potentially jeopardized" the decisional process, the FWS filed a motion for voluntary remand and vacatur and confessed legal error as to

---

[8] The court also noted that the motion for remand and vacatur asked for both remand and vacatur and did not seek remand as an alternative.  *Id.* at 3.  Thus, the court did not consider whether remand was alternatively available.  *Id.* ("[OSM] . . . ask[s] this Court not only to remand the case, but to vacate the SBZ Rule.")  In contrast, here the FWS seeks remand alone if this Court does not grant vacatur.  FWS Mem. at 15.

the 2008 critical habitat designation and recovery plan, based on that report. The environmental groups supported the remand and vacatur and CIC opposed it. *Id.*

The court held that it "lacks the authority to grant the [FWS's] request for vacatur without a determination on the merits." *Id.* at 136. The court found support in the plain language of 5 U.S.C. § 706(2), which it characterized as "directing a reviewing court to hold unlawful and set aside agency action . . . that it *finds* [to be] . . . not in accordance with the law." *Id.* at 135 (emphasis in original). Indeed, quoting *National Parks Conservation*, the court held that "to summarily grant the [FWS's] request for vacatur 'would allow the [FWS] to do what they cannot do under the APA, repeal a rule without public notice and comments, without judicial consideration of the merits.'"[9] *Id.* at 135–36.

### B.   The FWS has Cited No Cases In Which A Court Ordered A Rule Vacated Without First Determining That It Was Unlawful.

The FWS has cited no cases in which a court granted vacatur without a first finding it unlawful on the merits. Indeed, it appears, as the court in *National Parks Conservation* noted, that there is no such precedent. Also, all the cases cited by FWS, except one, involved a court *first* finding that the rule was *unlawful* and *then* determining whether to retain the rule during remand due to equitable considerations. FWS Mem. at 12.

FWS first cites *Ariz. Pub. Serv. Co. v. U.S. EPA*, 562 F.3d 1116, 1122 (10th Cir. 2009), in which, the Tenth Circuit granted the EPA's motion for remand and vacatur after holding on

---

[9] The court did, however, determine that remand was appropriate, which was opposed by both environmentalists and CIC. *Id.* at 134–35. WFBF and WSGA do not agree with the holding that remand was appropriate because the court primarily relied on cases that involved adjudications rather than rulemakings. *Carpenters Industrial Council*, 734 F.Supp. 2d at 132 (citing *SKF USA Inc. v. United States*, 254 F.3d 1022 (Fed. Cir. 2001) ("anti-dumping" adjudication) and *Sierra Club v. Antwerp*, 560 F.Supp.2d 21 (D.D.C. 2008) ( adjudication under Section 404 of the Clean Water Act)); *see Utility Group Solid Waste Activities Group*, 236 F.3d at 752–53 (rejecting the concept that an agency has "inherent authority" to reconsider its rulemakings).

the merits that the "EPA did not adequately explain its rationale for [imposing fugitive dust] limits." *Id.* Importantly, there was no opposition to FWS's motion. *Id.* This case is inapposite because all parties agreed that the rulemaking was defective, the court held it was defective, and , therefore, properly granted vacatur. Here, there is no such agreement or finding that the Delisting Rule is unlawful.

Next, the FWS cites *Idaho Farm Bureau Fed'n v. Babbit*, 38 F3d 1392, 1405 (9th Circuit 1995) for the proposition that a regulation *held unlawful* need not be vacated if equitable considerations advise against it:

> [W]hen a regulation is not promulgated in compliance with the APA the regulation *is invalid*. . . . However, when equity demands, the regulation can be left in place while the agency provides the proper procedural remedy.

FWS Mem. at 12 (quoting *Idaho Farm Bureau* at 1405) (emphasis added). For the same proposition, the FWS cites *Endangered Species Comm. of Bld'g Industry Ass'n of Southern Calif. v. Babbitt*, 852 F.Supp. 32, 41 (D.D.C. 1994) ("In unusual circumstances an *unlawfully promulgated* regulation can be left in place while an agency provides the proper procedural remedy") (emphasis added). *Id.* Finally, the FWS cites *Allied-Signal, Inc. v. U.S. Nuclear Regulatory Comm'n*, 988 F.2d 146, 150-51 (D.C. Cir. 1993), *United Mine Workers v. Federal Mine Safety & Health Admin.*, 920 F.2d 960, 967 (D.C. Cir. 1990), and *United Mine Workers v. Dole*, 870 F.2d 662, 673-674 (D.C. Cir. 1989) for essentially the same proposition. *Id.* These cases are inapposite because they deal with a court's discretion *not* to vacate after holding a rule unlawful. Here, the opposite is the case—FWS seeks to *vacate* a rule that has *not* been held unlawful.

Finally, the FWS argues that the cases it cited support the proposition that a court may *vacate* a rule that the court has *not* found unlawful, based on the equitable factors considered by the courts in the cases cited by the FWS. FWS Mem. at 12–15. The FWS relies for this proposition exclusively on two inapposite cases. The first is *Natural Res. Def. Council v. U.S.*

*Dep't of the Interior*, 275 F.Supp.2d 1136. 1143 (C.D. Cal. 2002).  In that case, the FWS asked

the court to remand, but not vacate, a critical habitat designation that utilized a "baseline

approach" to calculate the economic impact of the designation, which had been disapproved by

the Tenth Circuit.  *Id*. at 1141 (citing *New Mexico Cattle Growers Ass'n v. U.S. Fish and Wildlife

Service*, 248 F.3d 1277, 1285 (10th Cir. 2001)).  Critically, though the court remanded, it *did not

vacate* the designation of habitat.  *Id*. at 1156.  Furthermore, the court held that the designation of

habitat was unlawful, contrary to the assertions of the FWS that it was not.  *Id.* at 1141–42.  The

court ruled, "The court finds the analysis in *New Mexico Cattle Growers* persuasive.

*Accordingly*, the Court grants the motion for voluntary remand[.]"  *Id*. at 1142 (emphasis added).

Then the Court specifically held that it "agrees that *New Mexico Cattle Growers* is correctly

decided, and the Service must reconsider the economic impact of these two critical habitats in

accordance with the Tenth Circuit's teachings."  *Id*. at 1156.

 Ignoring this clear holding, the FWS relies on a single sentence in the remedies section of

the decision for their argument that the court did not rule on the merits.  In that section, the court

made an anomalous and unnecessary statement, unsupported by any cited authority:  "Although

the court does not actually rule on the merits of defects in the economic impact analysis . . . the

same equitable analysis for vacatur of the rules during remand should apply here."  *Id*. at 1143.

That single sentence, lifted from the context, rulings and holding of the case, cannot support

FWS's assertion.  That sentence is inexplicable, anomalous, and conflicts with the rest of the

opinion.  It is at best ill-considered dicta.

 Indeed, in the next sentence, the court ruled that "the test for whether to remand an

*arbitrary and capricious rule* depends in part on the seriousness of [its] deficiencies . . . and the

disruptive consequences of an interim change that may itself be changed."  *Id*. (emphasis added).

This statement assumed that the rule was arbitrary and capricious, in harmony with the remainder of the opinion that held it unlawful.  This case, is, therefore, entirely inapposite. [10]

The second case on which FWS relies is an unpublished opinion in *Coalition of Arizona/New Mexico Counties for Stable Economic Growth v. Salazar*, No. 07-cv-00876 (D.N.M. May 4, 2009) (Dkt. No. 51) at 5.  FWS Mem. at 12.  In that case, cattle growers sued challenging a critical habitat designation for the Spikedace and Loach Minnow, arguing that the designation was too large.  *Id.* at 1–2.  Environmental groups intervened alleging that the designation was too small.  *Id.* at 2.

During this litigation, the Inspector General for the Department of the Interior issued a report finding that there may be a conflict between policy and science in the habitat designation of the Spikedace and Loach Minnow.  *Id.*  As a result, the FWS filed a motion for voluntary remand, but not vacatur, to reconsider the designation in light of the Inspector General's report.  *Id.*  All parties supported the remand, but plaintiffs also requested a vacatur, which the environmentalists and FWS opposed.  *Id.*

The court stated that it "will not actually rule on the merits" and then proceeded to determine whether, considering equitable principles, it should retain the rule during remand.  *Id.* at 5.  Thus, it considered whether to vacate or not without a merits finding, relying on *Natural Resources Defense*, which, as demonstrated above, held the rule *unlawful* before it *retained the*

---

[10] Ironically, the Ninth Circuit later rejected the *New Mexico Cattle Growers* decision and adopted the "baseline approach" to economic analysis.  *Ariz. Cattle Growers' Ass'n v. Salazar,* 606 F.3d 1160, 1173 (9th Cir. 2011) ("We therefore reject the Tenth Circuit's approach in *New Mexico Cattle Growers* as relying on a faulty premise and hold that the FWS may employ the baseline approach in analyzing the critical habitat designation.")  It certainly counsels against vacatur when the decision relied upon for vacatur does not constitute binding precedent for a court located in another circuit.

*rule* during remand.  Like that court, the court in *Coalition of Arizona/New Mexico Counties* refused to grant vacatur.  *Id*. at 10. .

The court also relied on *Trujillo*, which has no application here because it involved an adjudication.  The court also relied on *Ethyl*, in which all parties agreed that the record was defective due to new evidence contradicting the previous finding.  There is no such agreement by the parties here.  Thus, *Coalition of Arizona/New Mexico Counties* more closely resembles *Carpenters Industrial Council*, 734 F.Supp. at 135–36, which remanded but held that it did not have the power to vacate without finding the rule unlawful on the merits. [11]

This unpublished opinion is wholly unconvincing and does not support the FWS's position.  It stands alone as an anomalous oddity.  The bottom line is that the FWS has not cited one published case in which a court vacated a notice and comment rulemaking without first finding that the rulemaking was unlawful.

## III.  NO VACATUR DURING A REMAND IS REQUIRED BECAUSE THERE IS NO POTENTIAL HARM TO THE MOUSE OR PETITIONERS BY RETAINING THE DELISTING RULE.

Finally, the FWS opines that "the Court's analysis on vacatur should focus on the potential harm to the Preble's in light of the purposes of the ESA" in determining whether to vacate the Delisting Rule and reinstate the 1998 rule.  FWS Mem. at 13.  Even if a court could, without findings on the merits, vacate a notice and comment rulemaking, FWS has pointed out no such equities that would mandate such a result.[12]

---

[11] As noted above, WFBF and WSGA disagree with the remand in *Carpenters Industrial Council*, but agree with its denial of vacatur without a determination on the merits.

[12] Indeed, there are many equities that would counsel against vacatur.  WFBF and WSGA agree with the State of Wyoming, which cites the many disruptive and harmful affects that would result in the reinstatement of the 1998 rule.  *See* Respondent Intervenor State of Wyoming's Response to Federal Respondents' Motion for Voluntary Remand and Vacatur at 15–20.  Dkt. No. 74.

The 2008 findings and conclusions of the FWS, which were based on the best scientific and commercial data available, came to the opposite conclusion:

> Based on the best scientific and commercial data available, we have determined that . . . the subspecies is not threatened throughout all of its range [and that] *Prebles' . . . populations in Wyoming are more widespread and threats to the subspecies less severe than those known at the time of listing*, but that in Colorado the Prebles is likely to become endangered within the foreseeable future.

73 Fed. Reg. 39,790 (July 10, 2008) (emphasis added).  The FWS further elaborated:

> Based on a better understanding of distribution and threats, we find that the available data do not support the conclusion that the Prebles is likely to become endangered in the foreseeable future throughout "all" of its range.  Overall, *in the absence of the Act's protective measures, we believe the subspecies will likely remain secure and well distributed across Wyoming into the foreseeable future*. Distributional data has verified that the subspecies is more widespread in the North Platte River basin of Wyoming than previously known, and we are not aware of any threats that are likely to have significant effects on the long-term conservation status of populations of Prebles in this portion of its range.  We *expect threats to the Wyoming portion of the subspecies' range to be minor with only small and localized effects*.  We believe North Platte populations are sufficiently large and widely distributed to withstand these impacts.  *We conclude that the lack of present or threatened impacts to the Prebles in these areas indicates that this subspecies is neither in danger of extinction, nor likely to become endangered within the foreseeable future*, throughout all of its range. Thus, the Prebles does not merit continued listing as threatened throughout all of its range.

*Id.* at 39,832 (emphasis added).  Indeed, having found no threat to the mouse by removing ESA protections in Wyoming, FWS may not rescind that finding by an allegation in a motion.  *See, e.g.*, *Utility Group Solid Waste Activities Group*, 236 F.3d at 753 ("the EPA would [not] be powerless to correct its mistakes [and] . . . has the power to do so, so long as it follows certain procedures  . . . spelled out in APA § 553(b) for usual notice and comment rulemaking").

Furthermore, the FWS does not acknowledge that it made any mistake in these factual findings, which are entirely separate from the legal considerations involved in the interpretation of the SPR language.  FWS only suggests that they might be inconsistent with "some of the Service's ESA Section 7 biological opinions ("BiOps") [that] specifically stated that the mouse

populations in Colorado and Wyoming are threatened by continuing development, habitat modification, and inadequate government protection." FWS Mem. at 14. While this possible conflict might constitute an argument for remand, it does not support vacatur.

But these BiOps are irrelevant even to remand, much less vacatur. The mouse's population dynamics, distribution, and threats data in these BiOps were based on outdated, irrelevant data from 1998 and prior years. Indeed, this is demonstrated even in the most recent such BiOp, issued to the Federal Highway Administration ("FHA") in October 2007, concerning a highway project being constructed in Wyoming. WYData AR 148 at 003566.[13] In discussing the mouse's population dynamics, distribution, and threats to the mouse, that BiOp utilized data collected from 1998 and prior years, rather than the newer data that provided a "better understanding of distribution and threats." *Id*. at 003573–003576. Without this new data, these BiOps are of little relevance or use, and certainly do not undermine FWS's reasoned conclusions based on the best *current* scientific and commercial data.

Thus, the best scientific and commercial evidence available indicates that there would be no harm to the mouse in the event of a remand without vacatur.[14] On the other hand, the disruption caused by vacatur and reinstatement of the 1998 rule would be highly disrupted, as demonstrated by the State of Wyoming. Finally, because there would no harm to the mouse, there can be no harm to the asserted interests of Petitioners.[15]

---

[13] References to WYData are to the supplemental administrative record supplied by Wyoming pursuant to order of this Court.

[14] WFBF and WSGA submit the FWS has not met its burden of proving either a remand or vacatur is appropriate. However, if this Court were to disagree, remand, and vacate, WFBF and WSGA request that this Court retain jurisdiction and require the FWS to meet the schedule set out in the FWS Mem.

[15] WFBF and WSGA have substantial reservations concerning whether any of the declarations filed by Petitioners' members establish organizational standing for Petitioners. Pet. Op. Brf., Exhibits A–C (Dkt. No. 54). They cannot demonstrate that they suffer a direct harm apart from

**CONCLUSION**

The FWS has set forth no new developments that justify the requested voluntary remand.

Nor may this Court vacate a legislative rule without first finding it unlawful on the merits.

Should this Court determine that remand for reconsideration is appropriate, WFBF and WSGA

submit that this Court should remand without vacatur, retaining the 2008 Delisting Rule.  Such a

result would cause no harm to the mouse or Petitioners and would not cause the substantial

disruption by reinstatement of the 1998 rule demonstrated by the State of Wyoming.  Finally, if

this Court determines to vacate the Delisting Rule, it should retain jurisdiction and hold the FWS

to the timetable it proposed.

DATED this 3rd day of June 2011.

Respectfully Submitted By:

/s/ Steven J. Lechner
Steven J. Lechner
J. Scott Detamore
MOUNTAIN STATES LEGAL FOUNDATION
2596 South Lewis Way
Lakewood, CO 80227
303-292-2021
FAX: 303-292-1980
lechner@mountainstateslegal.com
detamore@mountainstateslegal.com

---

their special interest in the mouse.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 563 (1992).
None of the Declarants claim that they have "direct contact" with the mouse in Wyoming, or
have ever even seen the mouse there.  *Idaho Farm Bureau v. Babbitt*, 58 F.3d 1392, 1398 (9th
Cir. 1995) ("intervenors in environmental litigation satisfy the injury in fact requirement by
showing that group members have *direct contact* with the environmental subject matter
threatened by an adverse decision") (emphasis added).  Nor do declarants claim to "study,
observe, and enjoy" the mouse in Wyoming.  *Id.* ("intervenors satisfied the injury in fact
requirement by demonstrating that their members . . . *study, observe, and enjoy* the otters in
specific regions of Alaska") (emphasis added).  In essence, assuming that the lack of ESA
protections in Wyoming may affect the mouse, Declarants' claimed injury is the reduction in
their direct contact with the mouse in Wyoming from "never" to "really never."

Attorneys for Intervenors, Wyoming Farm Bureau
Federation and Wyoming Stock Growers
Association

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that he filed this document utilizing this Court's CM/ECF system on the 3rd day of June, 2011, and that all other parties are registered in that system for this case and will be served electronically by the Court's CM/ECF system.

/s/ J. Scott Detamore
J. Scott Detamore